**David F. DAWSON, Defendant Below, Appellant,**

**v.**

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: March 13, 1990.
Decided: Oct. 4, 1990.

Paul S. Swierzbinski and Bernard J. O'Donnell, Asst. Public Defenders, Wilmington, for appellant.

Ferris W. Wharton, Deputy Atty. Gen., Wilmington, for appellee.

Before HORSEY, MOORE, WALSH and HOLLAND, JJ. and JACOBS, Vice Chancellor (sitting by designation pursuant to Del. Const. art. IV, § 12) (constituting the Court en banc).

HOLLAND, Justice:

Following a jury trial in the Superior Court, in and for Kent County, the defendant-appellant, David F. Dawson ("Dawson"), was convicted of four counts of Murder in the First Degree, six counts of Possession of a Deadly Weapon During the Commission of a Felony, Robbery in the First Degree, Burglary in the Second Degree, and Possession of a Deadly Weapon by a Prohibited Person.[1] On June 28, 1988, after a two-day penalty hearing, the jury unanimously recommended a sentence of death for Dawson on each of the four counts of Murder in the First Degree.

On July 22, 1988, Dawson was sentenced to death by lethal injection, as a result of each of the murder convictions, in accordance with the jury's recommendations. The Superior Court also sentenced Dawson to be incarcerated for a total of 100 years with regard to the other convictions. On July 15, 1988, Dawson filed a motion for a new trial or, in the alternative, for a new penalty hearing. He also filed a motion to delay his sentencing. Both of those motions were denied.

Dawson's counsel filed a timely notice of appeal. An automatic appeal was also docketed. 11 *Del.C.* § 4209(g). Those appeals have been consolidated. Dawson's execution has been stayed.

In this direct appeal, Dawson argues that his convictions should be reversed because: (1) he was denied a fair trial and penalty hearing, when the Superior Court declined to rule on a motion *in limine* prior to jury selection; (2) the Superior Court denied his motion for a change of venue, which al-

1. Dawson was indicted by the grand jury of Kent County on January 5, 1987. All fifteen counts of the indictment related to events occurring on December 1, 1986. Two counts of the indictment charged Dawson with Burglary in

the First Degree and Misdemeanor Theft at the home of Frank and Dorothy Seeney, in the general vicinity of the murder scene. Dawson entered a guilty plea as to these two counts, but proceeded to trial on the other thirteen counts.

leged that there had been prejudicial pretrial publicity or, alternatively, that the increased likelihood a Kent County jury will recommend a death sentence introduces an element of bias and arbitrariness into the penalty determination process; (3) the Superior Court failed to properly excuse several jurors for cause and denied Dawson's motion for additional peremptory challenges; (4) the State presented evidence relating to the theft of two vehicles, when the State did not have clear and convincing evidence to connect Dawson with either of those crimes; and (5) the State presented irrelevant and prejudicial evidence of his commission of a burglary at the residence of Frank and Dorothy Seeney on the morning that the victim, Madeline Kisner, was killed.

Dawson also argues that he is entitled to a new penalty hearing because (1) the State's unbridled discretion in determining which defendants, convicted of Murder in the First Degree, will be subjected to a death penalty hearing is contrary to Delaware law and in violation of the Federal Constitution; (2) the Superior Court erroneously permitted the State to present evidence of his membership in the Aryan Brotherhood during the penalty hearing; (3) the Superior Court erroneously permitted the State to present evidence that his nickname was "Abaddon" along with the definition of that name, during the penalty hearing; and (4) the Superior Court erroneously instructed the jury, concerning its discretion in recommending the imposition of the death penalty.

We have reviewed each of Dawson's contentions. We find no reversible error. Therefore, the judgments of the Superior Court, which resulted in Dawson's convictions and sentences, including the imposition of the death sentences, are affirmed.

## FACTS

On the morning of December 1, 1986, between midnight and 2:30 a.m., Dawson escaped from the Delaware Correctional Center ("DCC") near Smyrna along with three other inmates: Mark McCoy ("McCoy"), Richard Irwin ("Irwin") and Larry Nave ("Nave"). According to the State, McCoy, Irwin and Nave stole one car and proceeded north, while Dawson stole another car and travelled south, where the events for which he was convicted occurred. In support of its theory, the State presented evidence of several car thefts, items obtained from the stolen vehicles, eyewitness testimony, items found in Dawson's possession when he was apprehended, and expert testimony concerning the scientific analysis of certain evidence.

### The Northbound Activity

During the early morning hours of December 1, 1986, a 1965 Mustang automobile was stolen from the northern part of the Town of Smyrna. At approximately 6:15 a.m., the police discovered this vehicle parked on the northbound shoulder of Route 13, about one-half mile south of Fieldsboro. Fieldsboro is located approximately eight and one-half miles north of Smyrna. The police recovered a latent fingerprint from the vehicle, which was subsequently identified as McCoy's, and an address book belonging to Nave.

Wilbert Dill ("Dill") testified that he operated the Fieldsboro Service Station, located at the intersection of Route 13 and Noxontown Road. When Dill arrived for work at approximately 5:45 a.m. on December 1, 1986, he saw three men standing by the station's bathrooms. Dill testified that, from the station's office, he watched the three men attempt to enter vehicles which were parked at the businesses located on the other three corners of the intersection. According to Dill, all three men seemed to be wearing similar blue clothing.

Cathy Spence ("Spence"), Nave's sister, identified the three men seen by Dill as Irwin, McCoy and Nave. Spence testified that her brother had telephoned her during the early morning hours of December 1, 1986. In response to those telephone calls, Spence stated that she went to the Fieldsboro Service Station. There, she provided Irwin, McCoy and Nave with clothing to replace their blue prison uniforms and transported them away. According to Spence, she remained with Nave, Irwin and

McCoy until 6:30 or 7:00 p.m. that evening, riding around the back roads of New Castle area. Spence testified that she never saw Dawson that day.

### The Southbound Activity

Sometime between 10:00 p.m., November 30, 1986, and 7:15 a.m. on December 1, 1986, a 1979 Oldsmobile Starfire was stolen from a location on the southern side of the Town of Smyrna. That vehicle was recovered by the Delaware State Police on County Route 139 outside of Kenton. Kenton is located southwest of Smyrna. The vehicle was first observed in this location between 6:00 and 6:30 a.m. on December 1, 1986.

Early that same morning, the home of Frank and Dorothy Seeney (the "Seeneys") was burglarized. The Seeneys' house is located on County Route 168, approximately 2 miles southwest of Kenton, not far from where the 1979 Oldsmobile Starfire car was found. Mr. Seeney testified that on the morning of December 1, 1986, he left home about 5:30 a.m. Mrs. Seeney left their home about 6:30 a.m. Upon returning from work, sometime after 3:30 p.m., Mrs. Seeney discovered the burglary. An inspection of the Seeney's home revealed that a men's size forty-eight motorcycle jacket, several pocket watches, and containers of loose change had been stolen. Prior to trial, Dawson pled guilty to the two counts in the indictment which charged him with the burglary of the Seeneys' home.

### The Murder Scene

The residence of Richard and Madeline Kisner is located approximately one-half mile from the Seeneys' home. Richard Kisner testified that on December 1, 1986, he left for work shortly after 7:30 a.m. His son, Brian, who was sixteen at the time, had left for school a few minutes before him. Richard Kisner testified that when he left for work, Mrs. Kisner was still at home. Her car, a 1986 Chrysler LeBaron, and a Ford pickup truck remained in the driveway.

Madeline Kisner, who usually arrived at her job by 8:30 a.m., never reported to work on December 1, 1986. Mrs. Kisner's friend and co-worker, Alice Holman ("Holman"), testified that she tried unsuccessfully to telephone Mrs. Kisner at home around 8:45 a.m., shortly after 9:00 a.m. and again about 1:15 p.m. When Holman telephoned Kisner's home again at approximately 3:40 p.m., Brian answered. According to Holman, Brian told her that his mother was apparently sleeping and he thought that she must be sick.

Brian testified that, on December 1, 1986, he arrived home from school between 3:30 and 3:40 p.m. and immediately went to his bedroom to change his clothes. Brian testified that, as he walked past his parents' room, he noticed his mother lying on her bed. She was wearing a red house coat, which she usually wore. It appeared to him that she was asleep. Brian said he assumed that his mother was sick and made no attempt to talk to her at that time.

Brian testified that after he received Holman's phone call, he went from the kitchen to the doorway of his parents' room. Brian then called to his mother but received no response. At this point, he noticed blood around his mother's head. Brian testified that he then went to his room, armed himself with a knife and, called the police. Thereafter, Brian went outside, locked himself in the family's Ford pick-up truck, and waited for the police.

When the police arrived, they found Madeline Kisner's body lying on her bed. She was dressed in a red housecoat. A nylon stocking was around her neck. Mrs. Kisner's hands had been bound behind her back with shoe laces. She had been gagged with a sock which had been placed over her mouth and knotted behind her head. She had lacerations on her forehead and multiple stab wounds to the chest area.[2]

2. Dr. Judith Tobin of the State Medical Examiner's office performed an autopsy. Dr. Tobin testified that Mrs. Kisner had sustained twelve stab wounds to the chest, a wound to the head and various attempted strangulation wounds to the neck. Dr. Tobin determined that cardiac tamponade (a hemorrhage within the pericardial sac which prevents the heart from pumping

At about 5:30 p.m., when Richard Kisner arrived home, the police were still conducting their investigation. Mr. Kisner testified that he was asked to ascertain what, if anything, had been taken from his house. He determined that the keys to the Chrysler LeBaron were missing and that the car was not in the driveway. He also discovered that some money, which had been on the top of the bedroom chest of drawers, was missing. Mr. Kisner could not remember whether his wife's purse was missing, but he did testify that she always kept several two dollar bills in her wallet.

### Dawson's Apprehension

Patty Dennis ("Dennis") testified that she encountered Dawson in the Zoo Bar in Milford, Delaware, on the evening of December 1, 1986. Dennis went to the bar around 6:00 p.m. on that date. Her roommate, Geraldine Ryan ("Ryan"), entered the Zoo Bar at approximately 7:00 p.m., and began talking to a man Dennis did not know. After a period of time, Dennis, Ryan, the man with whom she was speaking and several others went to another bar called the Hide–A–Way. Ryan's companion was wearing a black leather jacket which was too big for him. The group subsequently left the Hide–A–Way and went back to the Zoo Bar. Ryan's companion was asked to leave the Zoo Bar upon his return. Dennis identified Dawson as Ryan's companion.

On December 1, 1986, at approximately 9:25 p.m., Sergeant Keith Hudson ("Sergeant Hudson") of the Milford Police Department noticed a person matching Dawson's description leaving the Zoo Bar. Sergeant Hudson testified that the person he saw was approximately five feet ten inches tall, weighed about one hundred seventy-five pounds, had long hair, a beard, and was wearing a black leather motorcycle

type of jacket and hat. Sergeant Hudson testified that the person he observed exiting from the Zoo Bar, turned left at a street corner and disappeared. Sergeant Hudson and another officer pursued this individual, without success.

However, Sergeant Hudson did locate Mrs. Kisner's 1986 Chrysler LeBaron in a parking lot near the Zoo Bar. The police recovered a Herr's corn chip bag and the cellophane wrapper for a cigarette carton from inside the Kisner car. It was subsequently determined that Dawson's fingerprints were on both of these items. A postcard was also found in the Kisner car. It was signed with Dawson's nickname, "Abaddon." [3]

Approximately one hour later, at 10:30 p.m., on December 1, 1986, Trooper Douglas Hudson ("Trooper Hudson") of the Delaware State Police, responded to a call to investigate a one-car accident on Sussex County Route 207. That accident involved a blue Ford LTD which had been driven across the road into a ditch. The vehicle sustained extensive damage to the left front quarter panel, the front window, and the grill. At approximately 3:55 a.m., the following morning, it was discovered that the Ford LTD had been stolen from a location in the vicinity of the Zoo Bar. A hat, similar to the one which Sergeant Hudson had seen on the person he had chased the previous evening, was found in the vehicle. This caused Trooper Hudson to begin a house-to-house search in the area for Dawson.

At 5:25 a.m., the police found Dawson hiding on the floor of a Cadillac, which was parked approximately three-tenths of a mile from the Route 207 accident scene. He had a cut on his ear and blood on his hands. He was wearing the black motorcycle jacket which had been stolen from the Seeneys. In the jacket pockets, the police

blood) resulting from one or more of the stab wounds had caused Mrs. Kisner's death.

**3.** The postcard was not introduced during the guilt/innocence phase of the trial or at the penalty hearing. However, during the guilt/in-

nocence phase, the trial judge permitted the State to introduce the fact that a postcard was found in the Kisner car and that this postcard was signed with Dawson's nickname. At the penalty hearing, the Court permitted testimony that the name on the card was "Abaddon."

found four of the pocket watches [4] that had been stolen from the Seeneys. Among the currency seized from Dawson was at least one two dollar bill. A cotton sock, which visually appeared to match the sock used to gag Madeline Kisner, was also taken from Dawson's pocket.

### Scientific Evidence

Retired FBI Special Agent Andrew Podolak ("Podolak") testified at trial about various fiber comparisons that he conducted on the items of evidence which had been submitted to the FBI laboratory. Podolak compared the white cotton sock found in Dawson's pocket with the sock used to gag Mrs. Kisner. He determined that the socks matched in all microscopic and optical properties as well as in color, composition and construction. In addition, Podolak found red triacetate fibers on both the black motorcycle jacket and the black tee shirt worn by Dawson, which matched in every observable microscopic and optical property, the red triacetate fibers found in Mrs. Kisner's robe.

Also testifying for the State were FBI serologists Joseph Errera and Randall Murch. They determined that blood found on Dawson's clothing contained genetic markers which were inconsistent with his own blood type but were consistent with Mrs. Kisner's blood type.

The defense presented three witnesses during the guilty/innocence phase of the trial. Dawson did not testify. On June 24, 1988, Dawson was found guilty as charged as to all counts.

### Penalty Hearing

At the penalty hearing, the State presented the testimony of Cathy Guessford, a records custodian from the Delaware Correctional Center. Ms. Guessford related the details of Dawson's criminal history to the jury. This included Dawson's commitment to a juvenile correctional facility at age thirteen, five commitments or recommitments to the Division of Juvenile Corrections dating from October 1968, the determination that he was not amenable to the Family Court processes, fourteen prior felony convictions, three escapes from maximum security juvenile institutions and three adult escapes, and twenty-four conduct violations resulting in sanctions against him as an inmate.

At the penalty hearing Dennis elaborated upon her encounter with Dawson on the evening of December 1st. She testified that Dawson identified himself to her as Abaddon and told her that the name meant "one of Satan's disciples." Detective Joseph Huttie ("Huttie") testified that Webster's dictionary defines Abaddon as "angel of the bottomless pit." Huttie testified that when Dawson was arrested, a photograph was taken showing the name Abaddon tattooed across Dawson's stomach. Huttie also testified that Dawson's right hand bore a tattoo with the words "Aryan Brotherhood" above and below a diamond shaped symbol. The State introduced a stipulation describing the nature of the Aryan Brotherhood.

The defense presented two family members as witnesses at the penalty hearing. The jury returned a verdict unanimously recommending the imposition of the death penalty on each of the four counts of Murder in the First Degree.

### MOTION IN LIMINE

■ Prior to trial, Dawson's counsel learned that Dawson was a member of a prison group known as the Aryan Brotherhood. The record reflects that the Aryan Brotherhood is a white supremacist Nazi oriented gang. It originated at the San Quentin Prison in California in response to perceived threats from racial minority gangs of inmates.[5] Dawson has tattoos on

---

4. Ryan provided the police with another of the stolen pocket watches. She said Dawson had given it to her.

5. THE COURT: Counsel, as a follow-up on your representation regarding the nature of your understanding of what the Aryan Brotherhood is, I conducted a nexus search using the term brotherhood and was able to determine from wire services and other news media accounts which describe the organization that the Aryan Brotherhood is a white supremacist Nazi oriented gang which first originated in

his body displaying the name of this organization, above and below what is allegedly one of its symbols. Dawson's counsel also became aware that Dawson has several swastikas tattooed on his body and, that while incarcerated, Dawson had painted a large swastika on one wall of his prison cell.

In view of the information concerning the Aryan Brotherhood and the swastikas, Dawson's counsel filed a pre-trial motion *in limine*. Dawson's counsel sought a ruling excluding all testimony relating to Dawson's membership in the Aryan Brotherhood. The motion also sought to prohibit the State from requesting that Dawson exhibit any of his tattoos to the jury. In response to Dawson's motion *in limine*, the State indicated that it was not inclined to introduce evidence relating to the Aryan Brotherhood during the guilt/innocence phase of Dawson's trial, but that it would seek to do so during the penalty hearing, if Dawson was convicted.

Dawson's counsel submitted to the Superior Court that, despite the State's response, a ruling on the admissibility of evidence concerning the Aryan Brotherhood was needed before jury selection began. Dawson's counsel argued that if a ruling was not made before trial, he would be forced to use his peremptory challenges to strike potential jurors who would other-

wise be acceptable to Dawson.[6] The Superior Court declined to decide the merits of Dawson's motion *in limine* prior to trial. On April 8, 1988, the Superior Court ordered:

> the objections [raised by the defendant's *in limine* motion] shall be considered in the context of trial itself. The State shall not elicit the evidence objected to without prior notice to defense counsel and the [Superior] Court.

During a subsequent pretrial conference, Dawson's counsel asked the Superior Court to reconsider its April 8, 1988 ruling. However, the trial judge adhered to his prior decision stating:

> What I am saying is what I have already said. The State is prohibited from introducing any evidence or evidence relating to the Aryan Brotherhood without leave of the Court. I will judge its probative value and any defense balancing as necessary under Rule 403 in the context of what proceedings are at the time in which the evidence is offered.

In response to that reiterated ruling, Dawson's counsel requested that the Superior Court propound a *voir dire* question designed to identify potential jurors who might be improperly influenced by the introduction of the evidence about the Aryan Brotherhood. The State did not object to that motion by Dawson's counsel.[7] The

---

San Quentin Prison in California. Its apparent motto: Kill to get in and die to get out.

In various prisons throughout the United States this gang has a reputed violence against black and Latino prison gangs. I found no indication as to the acts of violence against particular religious groups on the part of the Aryan Brotherhood.

6. Specifically, Dawson's counsel indicated that he would like to have Blacks and Jews sitting on the jury, alleging sociologists have determined that these people are the most compassionate and understanding and, therefore, would be more inclined to acquit Dawson. Additionally, Dawson's counsel argued that if the sociologists are correct, these persons would be more likely to be against an imposition of the death penalty, if Dawson was found guilty. Thus, Dawson's counsel argued that he faced a dilemma in that, if the Superior Court failed to rule on the evidentiary issues in the motion *in limine* before trial, he would be forced to use peremptory challenges to strike Blacks and Jews.

7. PROSECUTOR: Your Honor, if we could amplify our position a little bit. [Defense Counsel] has reiterated his concerns about the possible racial or religious undertones that may be kicked up, if you will, by references to Nazism or Aryan Brotherhood or any such references. We have maintained and continue to maintain our position that these are all reflective of the defendant's character should we get to the penalty phase and the evidence is relevant at that point.

I just want to state for the record that with our sensitivity to [Defense Counsel's] perceived dilemma or problem that the jury may decide this penalty phase on something other than the evidence produced at the phase, at the penalty phase we are specifically sanctioning any questions that [Defense Counsel] wants to ask that probe that issue, that whatever *voir dire* he wants to get into that deals with that question we are amenable to.

Superior Court granted Dawson's request. *Voir dire* question # 20, which was asked of prospective jurors, stated:

"In this case there may be evidence relating to membership in an organization called the Aryan Brotherhood, a white supremacist group. Would this affect your ability to serve as a fair and impartial juror in this case?"

Dawson argues that the Superior Court committed reversible error in declining to rule on the merits of his motion *in limine* prior to trial. *"In limine"* is defined as "[o]n or at the threshold; at the very beginning; [or] preliminarily." Black's Law Dictionary 787 (6th ed. 1990). The term is used "in a broad sense to refer to any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n. 2, 105 S.Ct. 460, 462 n. 2, 83 L.Ed.2d 443 (1984).

■ The State argues that a ruling on the merits of Dawson's motion *in limine* would not necessarily have constituted a final determination on the admissibility of evidence about the Aryan Brotherhood. *Luce v. United States*, 469 U.S. at 41, 105 S.Ct. at 463. The State correctly points out that an *in limine* ruling is subject to change when the case unfolds. *Id.* "[E]ven if nothing unexpected happens at trial, the ... judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling." *Id.* *See also United States v. Masters*, 840 F.2d 587, 590–91 (8th Cir.1988); *State v. Floyd*, 295 S.C. 518, 369 S.E.2d 842 (1988); *Gilliam v. State*, 270 Ind. 71, 383 N.E.2d 297 (1978); *State v. Fernandes*, R.I.Supr., 526 A.2d 495 (1987). *Compare United States v. Burkhead*, 646 F.2d 1283 (8th Cir.1981); *State v. Lariviere*, R.I.Supr., 527 A.2d 648, 649 (1987).

"Ordinarily, the determination of what evidence will be admitted is left to the discretion of the trial court." *United States v. Burkhead*, 646 F.2d at 1285; *Strauss v. Biggs*, Del.Supr., 525 A.2d 992, 997 (1987). Although this discretion is not unbridled, it has generally included the option "to defer ruling on evidentiary issues until the evidence is actually offered for admission." *Id.* at 1286.

The general rule permitting [a trial court] to delay evidentiary rulings is designed to prevent unnecessary and unwarranted advisory opinions. It is sometimes unwise to decide whether to admit evidence before it is actually presented. If no advance ruling is made, the parties may decide to abandon their positions for reasons unrelated to the anticipated ruling of the court. A refusal to rule may thus promote judicial economy. In other situations, a delayed ruling is advisable because the facts as they develop during the course of the proceeding may affect the determination of admissibility.

*United States v. Burkhead*, 646 F.2d at 1286.

The Superior Court decided that the issues presented by Dawson's motion *in limine* should be ruled upon within the context of the trial. However, the Superior Court prevented the disclosure of potentially prejudicial information to the jury by prohibiting the State from introducing any evidence relating to the Aryan Brotherhood without its prior permission. The Superior Court also permitted Dawson's counsel to propose specific *voir dire* questions to be asked of the venire panel, as an additional safeguard, to protect against an adverse ruling on the objection to evidence about the Aryan Brotherhood.

By acting in accordance with the general rule, the Superior Court's decision, with respect to Dawson's motion *in limine*, was an exercise of discretion. Under the circumstances of this case, we find that the Superior Court properly exercised its discretion. Although it declined to rule on the admissibility of evidence about the Aryan Brotherhood until the State requested permission to introduce it at trial, the Superior Court granted Dawson's request for additional pre-trial *voir dire* about the Aryan Brotherhood, and it ordered the State not to refer to evidence about the Aryan Brotherhood without prior approval.

The Superior Court's action assured that the jury would not be improperly influenced during the trial if Dawson's objec-

tions to the evidence were sustained. By affording Dawson the pre-trial opportunity to expand the *voir dire* of the venire panel and by tailoring the *voir dire* questions to the circumstances of the case, the Superior Court protected Dawson against the seating of a juror, who might be biased by evidence about the Aryan Brotherhood, in the event Dawson's objections were overruled. *Riley v. State*, Del.Supr., 496 A.2d 997, 1007 (1985). The Superior Court's disposition of Dawson's motion *in limine* was responsive and effective.[8]

## CHANGE OF VENUE

### Prejudicial Pretrial Publicity

On May 22, 1987, Dawson's counsel filed a pre-trial motion for a change of venue. Super.Ct.Crim.R. 21(a). Dawson contended, in part, that extensive prejudicial pre-trial publicity precluded him from receiving a fair and impartial trial in Kent County, where the crimes had occurred. That motion was denied. Throughout the subsequent pre-trial proceedings, including the jury selection process, Dawson's counsel renewed his motion for a change of venue. On each occasion, that motion was denied by the Superior Court.

■ A change of venue will be granted only upon a showing of reasonable probability of prejudice.[9] *McBride v. State*, Del. Supr., 477 A.2d 174, 185 (1984) (citing *Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966)). To make such a showing, a defendant must present evidence of highly inflammatory or sensationalized pre-trial publicity sufficient for the court to presume prejudice. *Riley v. State*, 496 A.2d

at 1014. In the absence of showing inherently prejudicial pre-trial publicity, the defendant must demonstrate actual prejudice through *voir dire*. *Id.* at 1015. *Accord McBride v. State*, 477 A.2d at 185–86. "Whichever path is chosen, the decision to grant or deny a request for change of venue is a matter for the reasonable exercise of the trial court's discretion." *Riley v. State*, 496 A.2d at 1015 (citing *Parson v. Delaware*, Del.Supr., 222 A.2d 326 (1966), *cert. denied*, 386 U.S. 935, 87 S.Ct. 961, 17 L.Ed.2d 807 (1967)). Dawson asserted both bases for relief in his motion requesting a change of venue.

■ Initially, Dawson's counsel argued that the highly inflammatory and sensational nature of the pretrial publicity was sufficient to create a presumption that Dawson could not obtain a fair trial in Kent County. The record reflects that news of Dawson's escape and the murder of Madeline Kisner was broadcast on various television and radio stations serving Kent County. In addition, many articles concerning the prison escape and the murder appeared in both *The News Journal* and *The Delaware State News*, the two major papers of general circulation in Kent County.

The Superior Court reviewed the news media accounts submitted by Dawson's counsel, including an article printed in *The News Journal* on June 5, 1988, the day before jury selection was scheduled to begin. The Superior Court concluded that the news accounts were largely informational in scope and insufficient to give rise to a presumption of prejudice in the venire

---

**8.** The Superior Court ultimately concluded that the State could introduce evidence about the Aryan Brotherhood during the penalty phase of Dawson's trial. That decision was proper, for the reasons set forth in this opinion.

**9.** Superior Court Criminal Rule 21(a) once provided, in pertinent part, that a change of venue of criminal prosecution to either of Delaware's two other counties is warranted if "there exists in the county where the prosecution is pending so great a prejudice against [defendant] that he cannot obtain a fair and impartial trial in that county." In *McBride*, this Court stated that Rule 21 "should be amended to eliminate the requi-

site showing by a defendant that there exists 'so great a prejudice against defendant that he cannot obtain a fair and impartial trial in that county.'" 477 A.2d at 185 (quoting *Parson v. State*, 275 A.2d 777, 785 (1971)). We directed that henceforth, "a change of venue [be granted] upon a showing that there exists a 'reasonable probability' or 'reasonable likelihood' of prejudice against a petitioner." 477 A.2d at 185; *Riley v. State*, Del.Supr., 496 A.2d 997, 1014 n. 21 (1985). Superior Court Criminal Rule 21(a) was amended, as suggested, effective March 2, 1984.

panel which had been summoned for jury duty. The record supports that decision. A rational factfinder could reasonably conclude that Dawson had not presented "evidence of highly inflammatory or sensationalized pre-trial publicity sufficient for the [Superior] [c]ourt to presume prejudice...." *Riley v. State*, 496 A.2d at 1014–15. *Compare Rideau v. State of Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *McBride v. State*, Del. Supr., 477 A.2d 174 (1984). It is well established that routine pre-trial publicity of a criminal case will not justify granting a motion for change of venue. *Riley v. State*, 496 A.2d at 1014.

■ Alternatively, Dawson's counsel argued that, even if prejudice could not be presumed from the news media accounts, actual prejudice was demonstrated during the *voir dire* of the venire panel. The record reflects that it took almost four full days to impanel the jury. During this time, there was individual *voir dire* of one hundred thirty persons, from two jury panels, before the jury of twelve and the four alternates were chosen. At the beginning of the Superior Court's session each day and at the end of the jury selection process, Dawson's counsel presented the trial judge with his own statistical evaluation, which demonstrated that a high percentage of the potential jurors indicated they "had some knowledge or read something in the newspaper about the case." [10] The Superior Court was not persuaded to grant the motion for a change of venue on the basis of that statistical analysis.[11]

■ The accused's right to a trial by a jury of his peers is fundamental to our criminal justice system. *Irvin v. Dowd*, 366 U.S. 717, 721, 81 S.Ct. 1639, 1641, 6 L.Ed.2d 751 (1961). An essential ingredient of that right is that the jury consist of impartial jurors. *See Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948). However, the right to a fair trial by a panel of impartial, "indifferent jurors," does not require that "the jurors be totally ignorant of

**10.** The statistics presented by Dawson's counsel indicated:

| | Panel I | | Panel II | | | |
|---|---|---|---|---|---|---|
| | Day 1 | Day 2 | Day 3 | Day 3 | Day 4 | TOTAL |
| Peremptory: Dawson | 8 | 10 | 2 | 3 | 4 | 27 |
| Peremptory: State | 2 | 4 | 6 | 1 | 2 | 15 |
| Excused by Court | 3 | 7 | 2 | 3 | 9 | 24 |
| Challenges for Cause | 7 | 21 | 9 | 4 | 7 | 48 |
| Jurors Chosen | 3 | 3 | 4 | 0 | 6 | 16 |
| Total Jurors | 23 | 45 | 23 | 11 | 28 | 130 |
| Number who had knowledge of case: | 12 | 29 | 16 | 4 | 16 | 77 |
| Percentage who had knowledge of case: | 52.17% | 64.44% | 69.56% | 36.36% | 57.14% | 59.23% |
| Adjusted Percentage of those who had knowledge of case: | 63.15% | 80.55% | 76.19% | 57.14% | 80.00% | 74.75% |

Dawson's counsel arrived at the "adjusted percentage of those who had knowledge of the case" by excluding those jurors who were excused prior to being asked that question.

**11.** The statistical analysis presented by Dawson's counsel is similar to that relied upon in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). However, the facts in *Irvin* are readily distinguishable from the facts in

Dawson's case. In *Irvin*, eight of the twelve jurors, or 66% of those finally seated, indicated prior to trial that in addition to being familiar with the facts and circumstances surrounding the case, they thought that the defendant was guilty. *Id.* at 727, 81 S.Ct. at 1645. The *voir dire* record in *Irvin* showed that 90% of the jury panel members (excluding 10 who were never asked) had some opinion as to guilt ranging in

the facts and issues involved." *Irvin v. Dowd*, 366 U.S. at 721–22, 81 S.Ct. at 1642.

■ "Impartiality is not a technical conception. It is a state of mind." *United States v. Wood*, 299 U.S. 123, 145, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936). Prior knowledge of the facts and issues of the case, or even a preconceived notion of guilt or innocence, will not automatically disqualify a prospective juror "if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961); *Dutton v. State*, Del.Supr., 452 A.2d 127, 137 (1982).

The Constitution lays down no particular test and there is no ancient and artificial formula for ascertaining a juror's mental attitude of "appropriate indifference." *Irvin v. Dowd*, 366 U.S. 717, 724–25, 81 S.Ct. 1639, 1643–44, 6 L.Ed.2d 751 (1961). However, the method that has been consistently relied upon historically to ascertain a juror's mental attitude is *voir dire*. *Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984) (citing *United States v. Burr*, 25 F.Cas. No. 14,-692g, p. 49, 51 (No. 14,692g) (CC Va.1807) (Marshall, C.J.)). The purpose of *voir dire* examination is to provide the court with sufficient information to decide whether prospective jurors can render an impartial verdict, based upon the evidence developed at trial, and in accordance with the applicable law. *Dutton v. State*, 452 A.2d at 136; *Parson v. State*, Del.Supr., 275 A.2d 777, 780 (1971).

■ The fact that a high percentage of prospective jurors had some knowledge of information about Dawson's case did not establish *per se* that an impartial jury could not be impanelled in Kent County. *See Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). However, the situation did require the trial judge,

through a careful use of *voir dire*, to determine

> "what information each juror ha[d] heard or read, the source of the information and how it ha[d] affected his or her attitude toward the defendant and the case at hand. It is only after acquiring such knowledge that the judge is in a position to accurately evaluate a juror's responses and his eligibility to serve."

*Hughes v. State*, Del.Supr., 490 A.2d 1034, 1042–43 (1985).

■ Defendants in capital cases have a right to have jurors questioned individually in order to intelligently determine who should be challenged for cause and who should be challenged peremptorily. *Steigler v. State*, Del.Supr., 277 A.2d 662 (1972), *vacated in part*, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972).[12] The applicable Delaware statute provides:

> When a juror is called in a capital case, he shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar ... If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satisfaction of the court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event he shall be a competent juror, if not otherwise disqualified, challenged, or excused.

11 *Del.C.* § 3301. In Dawson's case, the *voir dire* examination of the venire panel was conducted individually. After following the requirements of the Delaware statute and the holdings of *Dowd*, the Superior Court concluded that each juror who was seated in Dawson's case could "lay aside his or her impression[s] or opinion[s] and

intensity from mere suspicion to absolute certainty. *Id.*

**12.** This Court, the Third Circuit Court of Appeals, and the ABA Standards Relating to Fair Trial and Free Press all recommend individual *voir dire* in non-capital cases involving "possible

juror exposure to prejudicial information." See *U.S. v. Addonizio*, 451 F.2d 49, 67 (3d Cir.1972), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972); *Hughes v. State*, 490 A.2d 1034, 1043 n. 7 (1985); The ABA Standards Relating To Fair Trial and Free Press § 3.5.

render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1643 (citations omitted).

 The trial court's finding of impartiality is entitled, even on direct appeal, to "special deference." *Irvin v. Dowd*, 366 U.S. at 724, 81 S.Ct. at 1643; *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). However, the trial court's finding of juror impartiality, notwithstanding prior knowledge or impressions, "cannot foreclose inquiry as to whether, in a given case, the application of [the] rule [of *Dowd*] works a deprivation of [the defendant's] life or liberty without due process of law." *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1643. When appropriate, as in highly publicized cases, this Court has a duty to independently evaluate the *voir dire* testimony of the impanelled jurors. *Id.; Hughes v. State*, 490 A.2d at 1041.

The standard for appellate review of this issue is set forth in *Irvin v. Dowd*. The trial court's finding of impartiality "ought not be set aside by the reviewing Court unless the error is manifest." *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1643. The trial judge is in a unique position to evaluate jurors' assurances of impartiality because demeanor plays a crucial role in the determination of impartiality. *Hughes v. State*, 490 A.2d at 1041; *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); *Dutton v. State*, Del. Supr., 452 A.2d 127, 137 (1982). A juror may not be able to speak for his own bias simply because he is unaware of its existence. *Smith v. Phillips*, 455 U.S. 209, 221–22, 102 S.Ct. 940, 948, 71 L.Ed.2d 78 (1982). *See also Patton v. Yount*, 467 U.S. at 1031, 104 S.Ct. at 2888; *Young v. State*, Del.Supr., 407 A.2d 517, 520 (1979).

In Dawson's case, the trial judge conducted a *voir dire* "examination designed to elicit answers which [would] provide an objective basis for his evaluation" of each juror. *Gray v. State*, Del.Supr., 441 A.2d 209, 219 (1982) (citing *Young v. State*, Del. Supr., 407 A.2d 517, 521 (1979), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 794 (1980)). The trial judge did not

merely "go through the motions." *Id.* The record reflects that the trial judge's determination of impartiality was made in Dawson's case only after an extended individual *voir dire* proceeding designed specifically to identify biased veniremen. *Patton v. Yount*, 467 U.S. at 1038, 104 S.Ct. at 2892. *Compare Hughes v. State*, Del. Supr., 490 A.2d 1034 (1985); *Parson v. State*, Del.Supr., 275 A.2d 777 (1971). "It is fair to assume that the method we have relied on since the beginning, e.g., *United States v. Burr*, usually identifies bias." *Patton v. Yount*, 467 U.S. at 1040, 104 S.Ct. at 2893.

The party seeking a change of venue has the "burden of tendering cogent proof that a fair trial could not be had in the county in which the indictment was returned." *McBride v. State*, Del.Supr., 477 A.2d 174, 184 (1984). Neither the *voir dire* testimony or the record of pre-trial publicity in Dawson's case reveal the "wave of public passion" that would have made a fair trial unlikely in Kent County. *Patton v. Yount*, 467 U.S. at 1040, 104 S.Ct. at 2893; *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. at 728, 81 S.Ct. at 1645; *Hughes v. State*, 490 A.2d at 1046. After an independent evaluation, we conclude that Dawson has not demonstrated a "reasonable probability" or "reasonable likelihood" of prejudice against him, *by the jury that was impaneled as a whole*, in Kent County. *McBride v. State*, 477 A.2d at 185. We find no manifest error in the Superior Court's decision to deny Dawson's motion for a change of venue, based upon prejudicial pre-trial publicity. *Irvin v. Dowd*, 366 U.S. at 723–24, 81 S.Ct. at 1642–43.

### *Capital Punishment in Kent County*

 Dawson's counsel also contends that the motion for a change in venue should have been granted by the Superior Court because, he was able to show, by a statistical analysis, that "it is far more likely that any defendant found guilty of murder in the first degree will receive the death sentence in Kent County than in New Castle County or Sussex County." Daw-

son's counsel argues that his statistical evidence demonstrates an element of arbitrariness in the penalty determination process in Delaware, which is unconstitutional under the Eighth Amendment of the United States Constitution. *See Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The statistical evidence upon which Dawson relies is that:

> since May 14, 1977, the effective date of [Delaware's] death penalty statute, and until 1986, there had been a total of one hundred eight (108) First Degree Murder indictments in New Castle County, forty (40) in Kent County, and forty (40) in Sussex County. Of the seven defendants currently under a sentence of death, six have been sentenced by Kent County juries. Kent County, with only twenty-one percent of the murder indictments for the State, is thus responsible for eighty-three percent of the death sentences.

Dawson argues that the foregoing statistics demonstrate that Kent County juries appear "uncommonly willing to condemn a man to die." *Witherspoon v. Illinois,* 391 U.S. 510, 521, 88 S.Ct. 1770, 1776, 20 L.Ed.2d 776 (1968).

The State submits that the statistical evidence upon which Dawson bases his claim is inadequate. The State argues that Dawson's analysis fails to address several important variables, *inter alia:* the number of cases in which the death penalty was sought in each county; the number of cases in which a penalty hearing was actually conducted in each county; variations in the nature and circumstances of the various cases in which a penalty hearing was held in each county; and variables in the character and propensities of defendants in each case in which a penalty hearing was held in each county. Additionally, the State points out that, apart from his own case and one other,[13] Dawson does not contend that any of the death sentences imposed in Kent County were unwarranted.

In ruling upon this aspect of Dawson's motion for a change of venue, the Superior Court stated:

> [The] defendant has failed to carry his ultimate burden of persuasion on this issue. His statistical method has not accounted for all the neutral variables unrelated to venue in each of the capital crimes which could have produced the same result. Nor has his method accounted for all of the neutral variables unrelated to venue in the character and propensities of each capital defendant which could have produced the same result.

In addition, the Superior Court stated:

> Moreover, [the] defendant's argument that Kent County juries are "uncommonly willing to condemn a man to die" fails even using his deficient statistical method. Of the last three Kent County first-degree murder cases involving a capital penalty phase, each has resulted in a life sentence. *See State v. Shipley, State v. Graham,* and *State v. Thompson.*

Dawson's statistical argument must be viewed in the context in which it is raised. *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987). Dawson "challenges decisions at the heart of the criminal justice system." *Id.* "[O]ne of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder." *Id.* (citing *Gregg v. Georgia,* 428 U.S. 153, 226, 96 S.Ct. 2909, 2949, 49 L.Ed.2d 859 (1976) WHITE, J., concurring). The implementation of these laws, by necessity, requires discretionary judgments. *Id.*

 The unique nature of the decisions at issue in the criminal laws against murder require caution before an inference is adopted based upon a statistical study. *Id.* Because discretion is essential to the criminal justice process, this Court, like the United States Supreme Court, demands exceptionally clear statistical proof before we

---

**13.** *State v. Sanders,* Del.Super., No. IK86–03–0898–0903, is a case presently pending before this Court, in which a Kent County jury found a defendant guilty but mentally ill and recommended the imposition of the death sentence.

would infer that the discretion accorded to juries in capital cases has been abused. *Id. See DeShields v. State,* Del.Supr., 534 A.2d 630, 646 (1987). We hold that Dawson's study is clearly insufficient to support an inference that an element of arbitrariness was introduced into his case by having his penalty hearing before a Kent County jury. *Id.* The Superior Court's decision denying Dawson's motion for a change of venue, on the basis of the deficiencies in his statistical presentation, is affirmed. *Id.*

## JUROR CHALLENGES

In addition to challenging the Superior Court's finding of impartiality concerning the Kent County venire panel collectively, Dawson contends that several of the Superior Court's decisions regarding individual jurors were erroneous. Dawson's argument concerning the rulings is three-fold. First, he contends that he was forced to use eight peremptory challenges, when the trial judge abused his discretion in refusing to excuse certain prospective jurors for cause.[14] Second, he contends that two of the jurors who served, Buel Parrish ("Parrish") and Francis Angel ("Angel") should have been excused for cause. Third, he contends that the trial judge's refusal to grant him additional peremptory challenges denied him the opportunity to strike Parrish, Angel and a third juror, Doris A. Duerr ("Duerr").

■ Dawson's first contention is that the Superior Court's failure to excuse eight jurors for cause required him to challenge each of them peremptorily, thereby violating his right to a trial by an impartial jury. U.S. Const. amend. VI and XIV. In addressing this argument, it is not necessary to determine the merits of the Superior Court's rulings which denied Dawson's challenges for cause. The United States Supreme Court has held that the "loss of a peremptory challenge," to cure a trial

14. Dawson's counsel had prepared a chart to illustrate the peremptory challenges he exercised when his challenges for cause were denied.

| Prospective Juror | Prospective Juror Number | Dawson's Peremptory | Challenge For Cause Requested By Dawson |
|---|---|---|---|
| 1. Michael D. Shahan (A099–109) | 10 | 3 | Yes (A–106) |
| 2. Jessie M. Shannon (A–109–122) | 11 | 4 | Yes (A–285–286, 291–296) |
| 3. Charles S. Coverdale (A–235–249) | 30 | 10 | Yes (A–243–247) |
| 4. Sylvia W. Cooper (A–291–298) | 41 | 12 | Yes (A–297) |
| 5. Andrew J. Fox (A–316–324) | 46 | 14 | Yes (A–322) |
| 6. Mary F. Harris (A–338–345) | 52 | 15 | Yes (A–344) |
| 7. Orrie W. Dean (A–382–392) | 61 | 17 | Yes (A–391) |
| 8. Donna J. Couden (A–457–465) | 73 | 19 | Yes (A–464) |

court's error in not dismissing a juror for cause, does not constitute a violation of the constitutional right to an impartial jury. *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988). "[P]eremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated." *Id. See also, DeShields v. State,* Del.Supr., 534 A.2d 630, 636 (1987).

The focus of Dawson's second contention is, quite properly, on the jurors who were seated to hear his case. *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). At trial, and on appeal, Dawson argues that two of these jurors, Parrish and Angel should have been excused for cause. According to Dawson, the Superior Court's failure to excuse Parrish and Angel, at a time when he had no peremptory challenges remaining, resulted in their service as jurors, in violation of his right to a fair trial by an impartial jury. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

▬▬ Dawson has three factual bases for his argument that Parrish should have been excused for cause. First, Dawson contends the fact that Parrish is Black raises the "potential" of racial prejudice, due to the admission of evidence about the Aryan Brotherhood. Second, Dawson questions Parrish's impartiality because, contrary to the Superior Court's written instructions to the entire venire panel, Parrish read a portion of a newspaper article about the case. Third, Dawson argues Parrish should have been excused because his brother was the victim of an unsolved murder in Philadelphia.

The record reflects that, in fact, Parrish was the only Black person seated on the jury. During *voir dire,* Parrish stated that evidence relating to the Aryan Brotherhood, a white supremacist group, would not affect his ability to be fair and impartial.[15] During *voir dire,* Parrish also disclosed that his brother had been the victim of an unsolved murder in Philadelphia in approximately 1978.[16] Parrish stated that this would not affect his ability to decide Dawson's case impartially.[17] In addition, during *voir dire,* Parrish disclosed that he unintentionally read part of a newspaper account, in violation of the Court's order not to read anything concerning the Dawson case prior to the completion of jury selection. However, Parrish said when he realized the article pertained to the Dawson case, he stopped reading it.[18] Parrish said

---

**15.** Q. In this case there may be evidence relating to membership in an organization called the Aryan Brotherhood, a white supremacist group. Would this affect your ability to serve as a fair and impartial juror in this case?
A. No, sir, it wouldn't.

**16.** We note that this Court has previously found no abuse of discretion when a trial judge declined to ask prospective jurors whether they or their families had been victims of a violent crime. *McBride v. State,* Del.Supr., 477 A.2d 174, 190–91 (1984); and *Jacobs v. State,* Del.Supr., 358 A.2d 725, 728 (1976).

**17.** Q. Have you or a relative or close friend of yours ever been the victim of a crime of violence?
A. Yes, sir.
Q. Where, when and what type of crime?
A. My brother was murdered about ten years ago in Philadelphia.
Q. Were you interviewed by any member of any law enforcement agency?
A. No, sir. I was away in the military at the time.

Q. Was there a prosecution of the offense?
A. No, sir.
Q. Was any arrest made?
A. No, sir.
Q. As a result of that circumstance, do you have any bias for or against the defendant in this case?
A. No, sir, I don't.
Q. As a result of that, do you have any bias or prejudice for or against the State in this case?
A. No, sir.

**18.** Q. Have you read or heard anything concerning this case through the news media, television, radio, newspapers or any other source?
A. I did happen to see a blurt yesterday in yesterday's papers after yesterday afternoon.
Q. What did you see in yesterday's paper?
A. Something concerning the trial, about Mr. Dawson's trial. It was about a seven, eight line paragraph in the paper.
Q. Did you read the article?
A. I'm afraid I did.

he had formed no opinion of Dawson's guilt or innocence as a result of what he read.

■ Dawson contends that Angel should have been excused for cause, as a consequence of his exposure to pretrial publicity.[19] During *voir dire*, Angel stated that he had read about the incident "when it first happened." He remembered that it occurred in Kenton and that "some lady got killed." He also related that he had discussed what he had read with his wife. In response to the trial judge's *voir dire* inquiry, Angel stated that he had not formed an opinion regarding Dawson's guilt or innocence and would be able to render a fair and impartial verdict, solely upon the basis of the evidence presented at trial.

The trial court has broad discretion in determining whether a prospective juror should be excused for cause. *Parson v. State*, Del.Supr., 275 A.2d 777 (1971). Determinations of juror impartiality are the responsibility of the trial judge who has the opportunity to question the jurors, observe their demeanor, and evaluate the ability of the jurors to render a fair and impartial verdict. *DeShields v. State*, 534 A.2d at 636; *Williams v. State*, Del.Supr., 494 A.2d 1237, 1243 (1985). Since the trial court's finding of impartiality will rest on the judge's personal observation of the *voir dire* proceedings and on the judge's impression regarding the credibility of the jurors, a reviewing court should give those findings great deference. *DeShields v. State*, 534 A.2d at 636.

The record reflects that the Superior Court questioned Parrish and Angel specifically, during their individual *voir dire*, about each of the areas of Dawson's concern. The Superior Court personally assessed Parrish's and Angel's unequivocal assertions of their ability to serve impartially and found each of them to be credible. *DeShields v. State*, 534 A.2d at 636; *White v. State*, Del.Supr., 404 A.2d 137, 139–40 (1979). On this record, we find no abuse of discretion in the Superior Court's decision not to strike either Parrish or Angel for cause. *DeShields v. State*, 534 A.2d at 636.

Q. Did you receive the Court's instruction dated May 10th with the jury summons that instructed you not to read, view or listen to any reports in the press, radio or television about the case?
A. Yes, sir, I did.
Q. Do you have any explanation for your disregard of that?
A. Well, it was unintentional. I had to read it before I realized what had happened. It was just an oversight.
Q. Before you finished the article, did you realize it was about this case?
A. Yes, sir, I did.
Q. You continued to read it?
A. No, I stopped reading after I realized what it was.
Q. What do you recall the article saying?
A. Just saying something about jury selection for the Dawson trial. That's when I stopped reading.
Q. Did you read the entire article or not?
A. No, sir, I did not read the entire article.
Q. Have you read or hearing anything else about this case at any other time through the news media or any other source?
A. No, sir, I haven't.
Q. Did you discuss with anyone else anything that you read or heard about this case?
A. No, sir.
Q. Have you formed any opinion as to the guilt or innocence of the defendant in this case as a result of what you read or heard through the news media or discussed with anyone else?
A. No, sir, I have not.
Q. Would anything you read or heard through the news media or elsewhere make it difficult for you to render a fair and impartial decision in the case based solely on the evidence introduced at the trial and the instructions given you by the Court?
A. No, sir, it wouldn't.

19. On appeal, Dawson also argues that Angel should have been excused for cause since he stated that he believed in the death penalty. However, there was no request for supplemental inquiry on this point during *voir dire* and it was not part of the basis on which Dawson challenged Angel for cause. Supr.Ct.R. 8. Nevertheless, the law is clear that a belief in the death penalty cannot *ipso facto* disqualify a juror from service in a capital murder case. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). "The proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. at 852. *See also DeShields v. State*, 534 A.2d at 634. Angel swore that he could adhere to his oath and be fair and impartial.

In his third argument relating to the jury selection process, Dawson contends that he was denied a fair trial by the Superior Court's rejection of his request for additional peremptory challenges. Dawson asserts that the Superior Court's refusal to grant him additional peremptory challenges denied him the opportunity to strike not only Parrish and Angel, but also Duerr. Dawson's counsel asserts that his own trial notes indicate he would have used a peremptory challenge to strike Duerr, if he had one to exercise. Since Duerr was not challenged for cause, Dawson's argument with regard to her service as a juror is based solely upon the Superior Court's peremptory challenge rulings.

In March, 1988, following a preliminary hearing, Dawson's counsel filed a motion for additional peremptory challenges. Dawson's counsel argued that because the evidence would be highly inflammatory and because of the manner in which the case had been reported by the media, the twenty (20) peremptory challenges allowed under Superior Court Criminal Rule 24(b) would "in all probability be insufficient to adequately permit counsel to select an impartial jury." On April 8, 1988, the Superior Court denied that motion "without prejudice to renewal at jury selection."

On the third day of jury selection, after Dawson's counsel had exercised his twentieth and last peremptory challenge, he renewed the motion for additional peremptory challenges. Although the trial judge denied Dawson's renewed motion for additional peremptory challenges, he indicated that the issue could be raised again, should it be necessary to go beyond the initial group of ninety-two prospective jurors in order to seat the jury.[20] Dawson contends that this ruling constitutes reversible error.

Peremptory challenges are not constitutionally required. *Ross v. Oklahoma*, 108 S.Ct. at 2278–79 (internal quotation omitted); *Jackson v. State*, Del.Supr., 374 A.2d 1 (1977). Consequently, peremptory challenges exist as a matter of privilege. *Hickman v. State*, Del.Supr., 431 A.2d 1249, 1250 (1981). The purpose, the manner of use, and the number of peremptory challenges allowed are determined by State law. *Ross v. Oklahoma*, 108 S.Ct at 2279. Accordingly, the denial of Dawson's request for additional peremptory challenges must be reviewed in the context of Delaware's law on the subject.

Superior Court Criminal Rule 24(b) provides that *multiple* defendants in capital cases shall be entitled to a total of twenty peremptory challenges, *not twenty each*. *Hickman v. State*, 431 A.2d at 1250. Superior Court Criminal Rule 24(b) reads, in pertinent part, as follows:

> In capital cases the State shall be entitled to 12 peremptory challenges and the *defendant or defendants* shall be entitled to a *total of 20* peremptory challenges....

> *If there is more than one defendant,* the Court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly.

Super.Ct.Crim.R. 24(b) (emphasis added). In this case, since he was tried alone, *Dawson received all twenty* of the peremptory challenges provided for in Rule 24. In effect, Dawson contends that this Court should find the trial judge abused his discretion by following Rule 24 precisely, at least through the first panel of prospective jurors.

We find that Dawson has been "unable to establish either abuse of discretion or actual prejudice" as a result of the Superior Court's decision not to grant him additional peremptory challenges. *DeShields v. State*, 534 A.2d at 636. The record reflects that the Superior Court complied with the mandatory requirements of Rule 24(b) and afforded Dawson twenty peremptory challenges. *Id.* The record also reflects that no antagonistic juror was seat-

---

**20.** After the initial ninety-two potential jurors had been exhausted, a second group of potential jurors had to be called in order to seat a full jury, including the four alternates. Before jury selection from the second group proceeded, the Superior Court granted five additional peremptory challenges to Dawson and three to the State. Dawson does not challenge that ruling or any other portion of the jury selection process involving this second group of jurors.

ed, after Dawson had exercised all of his peremptory challenges. *Id.* The Superior Court's decision not to grant Dawson additional peremptory challenges, until after the first jury panel had been exhausted, is affirmed. *Id.;* Super.Ct.Crim.R. 24(b).

## EVIDENCE OF EARLIER BURGLARY

■ Dawson was tried on thirteen counts of a fifteen-count indictment. Two counts of the indictment charged Dawson with Burglary in the Second Degree and Misdemeanor Theft at the Seeney home, a brief time before the murder of Madeline Kisner. Dawson entered a guilty plea to those charges prior to trial.

The State offered evidence of the Seeney burglary, during the guilt/innocence phase of Dawson's trial. With that evidence, the State sought to establish that Dawson was in the Kenton area at the time Madeline Kisner was murdered. Dawson acknowledges that evidence establishing that he was within one-half mile of the Kisner home on the morning of Madeline Kisner's murder was relevant to the State's case. However, Dawson submits that the Superior Court erred in admitting evidence that he burglarized the Seeney residence, while he was in the Kenton area.

In the Superior Court, Dawson argued that evidence of this "other crime" at the Seeney residence was inadmissible according to D.R.E. 404(b). Alternatively, Dawson argued that, if the evidence of the Seeney burglary was not precluded by D.R.E. 404(b), it was nevertheless inadmissible, because the probative value of that evidence was outweighed by its prejudicial nature. D.R.E. 403. The State argued that the evidence of this "other crime" was admissible as an integral part of the immediate context of the crimes for which Dawson was being tried, and, therefore, was not governed by Rule 404(b). *United States v. Bass*, 794 F.2d 1305, 1312 (8th Cir.1986).

The Superior Court assumed, without deciding, that D.R.E. 404(b) was applicable to the State's request to introduce evidence of the Seeney burglary. The Superior Court articulated two reasons for its decision. First, it concluded that even if the State's position was correct, and evidence of the Seeney burglary was not within the scope of 404(b), Rule 403 nevertheless required the Court to determine if the probative value of the evidence was outweighed by its prejudicial nature. Second, the Superior Court decided to "give Dawson the benefit of all protections afforded by the Delaware Uniform Rules of Evidence."

After articulating the basis for its analysis, the Superior Court carefully applied the guidelines set forth by this Court in *Getz v. State*, Del.Supr., 538 A.2d 726 (1988). In doing so, the Superior Court stated, in part:

The probative value of the evidence must be balanced against the danger of unfair prejudice. In the course of this case the defense has stated it does not dispute the Kisner burglary; thus, there is no danger here that the jury may unfairly infer the defendant committed the Kisner burglary merely because of the Seeney burglary.

The Seeney burglary was a property crime that is not inflammatory in nature. The jury has already heard testimony relating to various thefts of automobiles which also were not inflammatory.

I am satisfied that the precautionary instructions are likely to be effective in limiting the purpose for which the evidence may be used. I therefore conclude that the probative value is not substantially outweighed by the danger of unfair prejudice to the defendant.

We find no abuse of discretion. The record supports the Superior Court's conclusion that the probative value of the evidence of the Seeney burglary was not outweighed by its prejudicial nature. The Superior Court's decision which permitted the State to introduce evidence of the "other crimes" by Dawson at the Seeney residence with an appropriate precautionary instruction to the jury, is affirmed.[21] *Getz v. State*, Del.Supr., 538 A.2d 726 (1988).

---

**21.** The following precautionary instruction was given to the Dawson jury:

## EVIDENCE OF TWO CAR THEFTS

██ At trial and on appeal, Dawson asserts that the Superior Court erred in permitting the State to introduce evidence concerning the theft of two motor vehicles. During the guilt/innocence phase of Dawson's trial, the State presented evidence to show that McCoy, Nave and Irwin, who escaped from the Delaware Correctional Center with Dawson, stole a car in Smyrna and travelled north in it. That car, a 1965 Mustang, was stolen from the northern part of the Town of Smyrna prior to 5:45 a.m. It was found abandoned just south of Fieldsboro that same morning. McCoy's fingerprint and Nave's address book were recovered from the vehicle. Only McCoy, Nave and Irwin were observed in Fieldsboro by Dill, in the early morning hours of December 1, 1986.

The State also offered evidence to show that another vehicle was stolen from Smyrna contemporaneously with the theft of the 1965 Mustang. That other vehicle, a 1979 Oldsmobile Starfire, was stolen from the opposite side of the town of Smyrna. After it was stolen, the 1979 Starfire was first noticed, between 8:00 and 9:00 a.m., near the Town of Kenton, west of Smyrna.

Dawson argues that the theft of the 1965 Mustang by McCoy, Nave and Irwin was not relevant to any issue in his case. Dawson also submits that there was no direct evidence connecting him to the theft of the 1979 Oldsmobile Starfire. The State contends that the evidence of both car thefts was material to a central issue in the trial, i.e., whether Dawson, or someone else, killed Madeline Kisner. The State submits that this issue was framed at the outset of the trial by Dawson's counsel in his opening statement to the jury.[22]

In his opening statement, Dawson's counsel represented that Dawson would not dispute the evidence that he was in the Kisner residence, that he stole money from Madeline Kisner, that he bound her hands with her shoe strings and that he stole her car. However, Dawson's counsel also told the jury that they would hear evidence, in the form of a statement given by Dawson to the police, that he left Madeline Kisner alive in her residence with the other three escapees, McCoy, Nave and Irwin. According to Dawson's statement to the police,

---

"Evidence has been offered concerning [Dawson's] participation in a burglary and theft from the residence of Frank and Dorothy Seeney. This evidence has been offered for a limited purpose. You may not use that evidence as proof that the defendant was a bad person and therefore probably committed the offenses he is charged with. You may use the evidence only to help you in deciding whether the defendant was the person who committed the offenses charged in the indictment now on trial."

**22.** You are going to hear certain evidence which is not in dispute. There will be evidence and the defendant does not dispute the fact that on December 1st, 1986 he escaped from the Department of Correction in Smyrna, Delaware. There will be evidence and the defendant does not dispute the fact that on the morning of December 1st, 1986 he was inside the Kisner home and that he didn't have permission to be there. There will be evidence and the defendant does not dispute the fact that he stole some coins from the Kisner home.

There will be evidence and the defendant does not dispute the fact that he tied Madeline Kisner's hands with her shoe strings and there will be evidence and the defendant does not dispute the fact that he stole Madeline Kisner's car that

day, but, ladies and gentlemen, the fact that David Dawson might be an escapee, the fact that David Dawson might be a thief, doesn't automatically mean, ladies and gentlemen, that he is a murderer, and that sounds bad, doesn't it?

You are also going to hear evidence, ladies and gentlemen, that the statement which Mr. Dawson gave which will tell you that on the first of December, '86 that when he escaped he escaped with the three other individuals: Mark McCoy, Larry Nave and Richard Irwin. There will be evidence that the individuals separated sometime on December 1st, '86 and that these three individuals were subsequently captured on or about December 23rd far away in or near Arizona.

There will be evidence when defendant gave his statement on January 8, 1987 he indicated that he was in the home of Mrs. Kisner and he tied Mrs. Kisner and he will further indicate to you in that statement that when he left the Kisner home to get gas that Nave, McCoy and Irwin were in that house and that when he left Mrs. Kisner was alive and when he returned Mrs. Kisner was dead, and his three friends were gone and when you look at that statement and you read that statement you are going to see that his reaction at that time was that he cried, he collapsed, he touched the bloody body of Mrs. Kisner.

when he returned to the Kisner home, Madeline Kisner was dead and the other escapees were gone.

The Superior Court ruled that the State was entitled to introduce evidence that the other three escapees travelled together in the stolen 1965 Mustang in the opposite direction of the Kisner home. The Superior Court also ruled that the State could introduce direct and circumstantial evidence to support its contention that Dawson had an independent means of transportation to the vicinity of the Kisner home via the 1979 Oldsmobile Starfire. *Renzi v. State,* Del.Supr., 320 A.2d 711 (1974); *Henry v. State,* Del.Supr., 298 A.2d 327, 330 (1972); D.R.E. 404(b). The record reflects the relevancy of the evidence of both car thefts, in view of Dawson's defense that the other escapees had murdered Madeline Kisner. D.R.E. 402. We find no abuse of discretion in these evidentiary rulings by the Superior Court.[23]

### PROSECUTORIAL DISCRETION TO SEEK CAPITAL PUNISHMENT

■ Dawson argues that his death sentence should be commuted to life imprisonment, without the possibility of probation or parole, because penalty hearings were not held in other cases for defendants who were also convicted of Murder in the First Degree. According to Dawson, the current Delaware practice, whereby penalty hearings are not held following all first degree murder convictions, gives the prosecutor unbridled discretion in choosing cases in which to seek a death sentence.

Following a conviction of Murder in the First Degree, the Delaware statute requires the jury to make two unanimous determinations: first, that at least one statutory aggravating factor is present; and second, that a sentence of death be imposed, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense, and

the character and propensities of the offender. 11 *Del.C.* § 4209. Consequently, during a penalty hearing, the prosecutor must prove the existence of both statutory requirements, beyond a reasonable doubt, to the jury's unanimous satisfaction.

■ "Although the prosecutor operates within an adversary system, his duty is to seek justice, not merely convictions." *Sexton v. State,* Del.Supr., 397 A.2d 540, 544 (1979). Similarly, the duty to seek justice requires the prosecutor to refrain from proceeding with a death penalty hearing, if the prosecutor makes an independent good faith determination that the State cannot meet its statutory burden of proof. "The capacity of prosecutorial discretion to provide individualized justice is 'firmly entrenched in American law.'" *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987) (quoting 2 W. LaFave & D. Israel, Criminal Procedure § 13.2(a), p. 160 (1984)). The United States Supreme Court has recognized that "a prosecutor can decline to charge, offer a plea bargain, or decline to seek a death sentence in any particular case." *Id.* At the same time, that Court recognized "the power to be lenient [also] is the power to discriminate," ... but a capital-punishment system that did not allow for discretionary acts of leniency "would be totally alien to our notions of criminal justice." *Id.*

The question raised by Dawson is whether historically in Delaware, or in his particular case, there has been an abuse of prosecutorial discretion in seeking the death penalty. In examining claims of prosecutorial abuse in this area of the law, this Court has recognized a rebuttable presumption that criminal prosecutions, including decisions to seek the death penalty, are undertaken in good faith and in a nondiscriminatory manner. *Albury v. State,* Del.Supr., 551 A.2d 53, 62 (1988). Dawson has presented no evidence to support his allegation of historical abuse of prosecutorial discretion in Delaware, when deciding wheth-

---

**23.** We note that Dawson's statement to the police was *not* introduced into evidence by either party, and that Dawson did not testify. Nevertheless, the State had the burden of proving the charges against Dawson and was entitled to present evidence that Dawson was alone when he murdered Madeline Kisner during its case-in-chief.

er to seek the death penalty following a first degree murder conviction. With respect to his own case, for the reasons hereinafter stated, the record reflects overwhelming evidence to support the prosecutor's decision to seek the death penalty for Dawson. Thus, we conclude that Dawson has failed to sustain his burden of persuasion on this issue. *Id.*

## EVIDENTIARY RULINGS DURING PENALTY HEARING

Following Dawson's convictions, the State represented that, during the penalty hearing, it intended to introduce: (1) expert testimony about the origin and nature of the Aryan Brotherhood, (2) testimony that Dawson referred to himself as Abaddon, had the name "Abaddon" tattooed in red ink across his stomach and that the name means "one of Satan's disciples" or "angel of the bottomless pit," [24] (3) photographs of Dawson's body depicting his tattoos, and (4) a picture of the swastika that Dawson painted on the wall of his prison cell. Dawson's counsel renewed the objections originally raised, in part, by the motion *in limine.* The defense argued that none of the evidence proffered by the State should be admitted during the penalty phase because it was inflammatory and irrelevant. Dawson's counsel also renewed the argument that if the State were allowed to introduce this evidence, Dawson's First Amendment rights of freedom of association and freedom of religion and his right to due process would be violated.

After considering the parties' arguments, on the issue of whether evidence concerning the nature of the Aryan Brotherhood and Dawson's membership in that organization would be relevant during the

penalty proceeding, the Superior Court stated:

> Well, I will narrow the issues to some extent. [I] find that membership or the act of joining an organization of any particular kind, whether it be the Aryan Brotherhood or the Boy Scouts of America can be probative of character, at least to some extent. The real issue before the Court is whether the probative value is outweighed by the danger of unfair prejudice. So let's focus the argument that way.

Immediately after this preliminary ruling, all of the attorneys requested a recess. Following the recess, the parties executed a stipulation describing the Aryan Brotherhood, and the State agreed not to call an expert witness to explain the origin and nature of that organization. The stipulation, which was received as evidence without further objection, read:

> The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.

In addition to admitting the stipulation into evidence during the penalty hearing, the State called Detective Joseph Huttie ("Huttie") to testify, with the aid of a photograph, that Dawson's right hand bore a tattoo with the name Aryan Brotherhood printed above and below a black and red diamond shaped symbol.

In this appeal, Dawson's counsel argues that no evidence concerning the Aryan Brotherhood should have been admitted during the penalty hearing. According to Dawson's counsel, after the Superior Court's adverse preliminary decision that

---

**24.** During the guilt phase of Dawson's trial, the Superior Court was not required to rule upon the admissibility of evidence relating to the Aryan Brotherhood, or the swastikas because the State did not seek to introduce such evidence. However, the Superior Court was called upon to address the admissibility of the name "Abaddon" and its meaning, when the State sought to introduce the postcard found in the Kisner automobile that had been signed "Abaddon." The Superior Court ruled:

> Given the other evidence that is available to link the defendant exclusively to the Kisner vehicle, the [Superior] Court is going to direct that there be no reference during the guilt/innocence phase to the name Abaddon. . . .
>
> I will allow, however, reference to the postcard during the State's case in chief and also indication through testimony that it was signed [with] a nickname known to be used by the defendant.

evidence concerning the Aryan Brotherhood would be relevant to Dawson's character, counsel was "forced" to enter the stipulation in order to guarantee that a relatively "sterile" description of the Aryan Brotherhood would be presented to the jury. Dawson's counsel submits that the stipulation simply characterized that organization and that the objection to the admissibility of any evidence about the Aryan Brotherhood was never withdrawn.

Over objections by Dawson's counsel, the Superior Court also ruled that the State would be permitted to introduce evidence of Dawson's use of the nickname Abaddon and what that name means during the penalty hearing. Huttie testified that, when Dawson was arrested, a photograph was taken showing the name Abaddon tattooed across Dawson's stomach. Huttie also testified that Webster's dictionary defines Abaddon as "angel of the bottomless pit." Patty Elizabeth Dennis ("Dennis") also testified concerning the name Abaddon during the penalty hearing. She stated that while at the Zoo Bar on the night of December 1, 1986, Dawson introduced himself to her as "Abaddon" and told her that the name meant "one of Satan's disciples."

After an inquiry as to the relevance of the swastika evidence to Dawson's character, the Superior Court ruled that the swastika evidence could not be introduced by the State at the penalty hearing without leave of the court. Following that determination, the State never sought to introduce any evidence concerning swastikas. Consequently, the question of whether such evidence could have been admitted is not in issue.

■ In a penalty hearing for a defendant found guilty of murder in the first degree, the sole issue is whether or not the death penalty should be imposed. The jury is called upon to make an individualized determination with respect to the appropriateness of the death penalty, based on the defendant's character and the circumstances of the crime. *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983). Admissible evidence includes "matters relating to any mitigating circumstances and to any aggravating circumstances." 11 *Del.C.* § 4209(c). A jury in a capital case may consider nonstatutory aggravating circumstances under the death penalty, and may take into account "all specific circumstances of the crime and the defendant." *State v. White*, Del.Supr., 395 A.2d 1082, 1089 (1978); *Deputy v. State*, Del.Supr., 500 A.2d 581 (1985), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987). Accordingly, a very wide range of evidence is admissible in a penalty hearing. *Flamer v. State*, Del. Supr., 490 A.2d 104 (1984), *cert. denied*, 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983). In this appeal, Dawson challenges the Superior Court's determination that evidence regarding the Aryan Brotherhood and the name Abaddon would properly be admissible as relevant to his character during the penalty hearing.

During the penalty hearing, the State contended that Madeline Kisner's murder was in keeping with the incorrigible nature of Dawson's character. The State argued that Dawson's life demonstrated an almost complete rejection of the rules which govern a civilized society. The State sought to prove its contention about Dawson's character in several ways.

The State presented evidence of Dawson's extensive criminal history.[25] That history revealed Dawson's repeated convictions for various crimes, resulting in a lifetime of almost continuous incarceration, beginning with Dawson's confinement as a juvenile at the age of thirteen. The State argued that Dawson's selection of the name Abaddon was—like his career of crime—characteristic of the persona chosen by Dawson. The State argued that Daw-

---

**25.** This history included Dawson's commitment to a juvenile correctional facility at age thirteen, five commitments or recommitments to the Division of Juvenile Corrections dating from October 1968, the determination that he was not amenable to the Family Court processes, four-

teen prior felony convictions, three escapes from maximum security juvenile institutions, three adult escapes, and twenty-four conduct violations resulting in sanctions against him as an inmate.

son's decision to join a prison gang, while he was incarcerated as an adult, was—like his escapes—characteristic of his lawless nature and his denouncement of rehabilitation while incarcerated.

 The Superior Court ruled that Dawson's use of the nickname Abaddon was relevant to his character. The record supports that decision. Dawson identified himself as Abaddon. Dawson signed a postcard with that name. He had that name tattooed across his stomach. Dawson introduced himself to Dennis as Abaddon, and explained his understanding of that name to her. What Dawson thought the name Abaddon meant and how it is commonly understood by others was relevant to his character because it was a reflection of how Dawson viewed himself and how he wanted to be viewed, even within hours after Madeline Kisner's murder.[26] *Cf. Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846, 859 (1989).

 The Superior Court ruled that evidence of Dawson's membership in the Aryan Brotherhood, as well as the nature and the origin of that group, was relevant to Dawson's character. The record also supports that decision. Dawson identified himself as a member of the prison gang known as the Aryan Brotherhood by having its name and logo tattooed on his body. Dawson's affiliation with this type of organization was not only indicative of how he identified himself and how he wanted to be identified by others, but again was characteristic of his lawless nature and rejection of rehabilitation during his incarceration. *See United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984).

**26.** Huttie was permitted to testify that Webster's Dictionary defined Abaddon as the "angel of the bottomless pit." This definition has a biblical origin. *See Revelations* 9:11 (King James). Dennis testified that Dawson told her Abaddon meant "one of Satan's disciples." Dawson's understanding of the meaning of his nickname is therefore consistent with its commonly accepted meaning.

**27.** The three statutory aggravating circumstances which the jury found to exist in Dawson's case were:

[27] Dawson argues that even if the evidence about the Aryan Brotherhood and the name Abaddon were relevant to his character, the use of that evidence against him during the penalty proceeding violated his rights of free speech and association. U.S. Const. amend. I; Del. Const. art. I, §§ 5 and 16. *See, e.g., Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); *Aptheker v. Secretary of State,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); *Noto v. United States,* 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961); *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). Additionally, Dawson argues that by improperly injecting race and religion into his trial, his constitutional right to due process was violated. *Baldwin v. Alabama,* 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); *Weddington v. State,* Del.Supr., 545 A.2d 607, 615 (1988); *Brokenbrough v. State,* Del. Supr., 522 A.2d 851 (1987). The State denies that it presented any issue of race, religion or political affiliation to the jury in violation of Dawson's rights.

During the penalty phase of Dawson's trial, the jury had to decide whether Dawson should be executed or imprisoned for the rest of his life. Before recommending a death sentence, it was mandatory for the jury to find that the State had proven the existence of at least one statutory aggravating factor. In Dawson's case, the jury found that the State had proven three statutory aggravating factors.[27] The jury was also required to make an *individualized* determination of whether Dawson should be executed or incarcerated for life, based upon Dawson's character, his record and

1. The murder was committed by a person who had escaped from a place of confinement.
2. The murder was committed while the defendant was engaged in the commission of burglary and/or robbery.
3. The murder was committed for pecuniary gain.

11 *Del.C.* § 4209(e)(a), (j) and (*o*).

the circumstances of the crime. *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) (emphasis in original) (citations omitted); *Zant v. Stephens*, 462 U.S. at 879, 103 S.Ct. at 2744; *Blystone v. Pennsylvania*, — U.S. —, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990); *Penry v. Lynaugh*, — U.S. —, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *State v. White*, Del.Supr., 395 A.2d 1082 (1978).

Because of the duty to be performed during a penalty hearing, "it is desirable for the jury to have as much information before it as possible when it makes the sentencing decision." *Gregg v. Georgia*, 428 U.S. 153, 204, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976). Nevertheless, "a death sentence based upon consideration of 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant' would violate the Constitution." *Baldwin v. Alabama*, 472 U.S. 372, 382, 105 S.Ct. 2727, 2733, 86 L.Ed.2d 300 (1985) (quoting *Zant v. Stevens*, 462 U.S. at 885, 103 S.Ct. at 2747). However, "[p]unishing a person for expressing his views or for associating with certain people is substantially different from allowing ... evidence of [the defendant's] character [to be considered] where that character is a relevant inquiry." *Commonwealth v. Abu–Jamal*, 555 A.2d at 859. Dawson's character was relevant to the jury's determination of whether he should be executed.

*Lockett [v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] and *Eddings [v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)] reflect the

belief that punishment should be directly related to the personal culpability of the criminal defendant. Thus, the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime rather than mere sympathy or emotion.

*California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987).

During the penalty hearing, the evidence the State presented to the jury regarding the Aryan Brotherhood and the name Abaddon properly focused the jury's attention on Dawson's character.[28] The State did not offer that evidence in order to improperly appeal to the jurors' passions and prejudices concerning race, religion, or political affiliation. *Cf. United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); *Weddington v. State*, Del. Supr., 545 A.2d 607 (1988); *Brokenbrough v. State*, Del.Supr., 522 A.2d 851 (1987); *Hooks v. State*, Del.Supr., 416 A.2d 189 (1980). The State's evidence, briefly defining the Aryan Brotherhood and the name Abaddon, was presented in a manner which did not shift the jury's attention away from the issue of Dawson's character. *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). The context of the State's evidence was necessary to explain Dawson's view of himself and how he wanted to be viewed by others.[29] *Id.*

We hold that the evidence relating to the Aryan Brotherhood and the name Abaddon was properly considered by the jury during the penalty hearing. That evidence was

---

**28.** The State did not contend that Dawson's membership in the Aryan Brotherhood or use of the name Abaddon provided the motivation for the murder. *Compare Barclay v. Florida*, 463 U.S. 939, 948, 103 S.Ct. 3418, 3424, 77 L.Ed.2d 1134 (1983). *See also United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir.1983).

**29.** In his closing argument during the penalty hearing, the prosecutor stated:

Dawson has taken the name Abaddon. We didn't tell you that because necessarily, or even for any religious reason, but it tells you something about what Abaddon means: The angel of the bottomless pit, one of Satan's disciples. What does that say about how he

views himself, how he would like to be seen by other people? What purpose could there be in calling himself the angel of the bottomless pit, Abaddon, other than to tell people you better watch out for me. I am bad.

This is not just a passing fancy, a fad, a phase in his life. It is a direction his life has turned. It is not just a nickname he goes by. He has marred his body with that tattoo: Abaddon. He is serious about this, ladies and gentlemen. All the way across his stomach A B A D D O N in block letters that high (indicating). He relishes that connotation, that impression of evil: The angel of the bottomless pit.

relevant to Dawson's character. Its admission did not violate Dawson's constitutional rights. *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); *Baldwin v. Alabama,* 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); *United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984); *Zant v. Stevens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *State v. White,* Del.Supr., 395 A.2d 1082 (1978).

## DEATH PENALTY INSTRUCTIONS

■ Dawson's next argument relates to the trial judge's comments to the jury at the inception of the penalty hearing. As part of his *introductory* remarks, the trial judge stated:

Members of the jury, the Delaware Criminal Code provides that upon conviction of a defendant of murder in the first degree the Superior Court shall conduct a separate hearing to determine whether the defendant shall be sentenced to death or to life imprisonment without benefit of probation or parole or without any other reduction of sentence. It is your function as the jury in this case to determine if the defendant will be sentenced to death or to life imprisonment without benefit of probation or parole or any other reduction.

The law does not require you under any circumstances to recommend a sentence of death. *Instead, you may in your discretion and regardless of circumstances recommend imposition of the death penalty.* You are required, however, to consider a sentence of death as a possible punishment in this case. I will give you detailed instructions on the applicable law at the conclusion of the evidence. (emphasis added).

Both parties agree that what the trial judge should have said, and apparently meant to say, was that "regardless of the circumstances, the jury could recommend *against* the imposition of death penalty."

The defense did not raise an objection to this comment at any time during the penalty hearing. Nevertheless, Dawson now argues that the trial court's introductory re-

marks at the penalty hearing "invited and authorized unbridled jury discretion in the penalty determination process of a capital murder case and constituted a clear violation of [his] rights under the eighth and fourteenth amendments." *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *State v. Dickerson,* Del.Supr., 298 A.2d 761, 764 (1972). This Court will generally decline to review contentions which were not fairly presented to the trial court for decision. Supr.Ct.R. 8.

However, this Court will review an issue not raised at trial if it constitutes plain error. Supr.Ct.R. 8; *Goddard v. State,* Del.Supr., 382 A.2d 238, 242 (1977).

Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice.

*Wainwright v. State,* Del.Supr., 504 A.2d 1096, 1100 (1986) (citations omitted). In reviewing Dawson's present claim of plain error, we must determine whether the trial judge's preliminary comments were erroneous as a matter of law and, if so, whether that error so affected Dawson's substantial rights that it jeopardized the fairness and integrity of the penalty hearing. *Id.*

■ As a general rule, a defendant in a criminal proceeding is not entitled to a particular form of jury instruction, but he does have the unqualified right to a correct statement of the substance of the law. *Flamer v. State,* 490 A.2d at 128. "When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process." *Walton v. Arizona,* —— U.S. ——, ——, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990). Clearly, the trial judge misspoke when he initially told the jury that it could recommend the death sentence for Dawson, regardless of the circumstances. Since the

jury did, in fact, recommend the imposition of the death penalty, we must examine the effect of the trial judge's erroneous remark.

In undertaking this evaluation, we are guided by the well-established rule "that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde v. California,* — U.S. —, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990) (quoting *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)); *Probst v. State,* Del.Supr., 547 A.2d 114, 119 (1988). Jury instructions do not need to be perfect. *Whalen v. State,* Del.Supr., 492 A.2d 552, 559 (1985). "Some inaccuracies and inaptness in statement are to be expected." *Flamer v. State,* 490 A.2d at 128 (citing *Baker v. Reid,* Del. Supr., 57 A.2d 103, 109 (1947)). "A trial court's jury charge will not serve as grounds for reversible error if it is 'reasonably informative and not misleading, judged by common practices and standards of verbal communication.' " *Id.* The proper focus of our inquiry in Dawson's case is whether there is a reasonable likelihood that the trial court's initial misstatement undermined the ability of the jury to accurately perform its duty in returning a sentence recommendation. *Boyde v. California,* 110 S.Ct. at 1198; *Flamer v. State,* 490 A.2d at 128. *See also Whalen v. State,* 492 A.2d at 559.

"Obviously, instructions play a critical role in the penalty phase of a capital case." *Whalen v. State,* 492 A.2d at 559. This Court and the United States Supreme Court have held that the sentencing procedures in capital cases must not create "a substantial risk that the [death penalty will] be inflicted in an arbitrary and capricious manner." *Id.* (citing *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (plurality opinion)). Although discretion in sentencing may not be eliminated completely, it must be "directed and limited". *Id. See also, Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988). "Thus, it is the trial judge's duty to guide the jury's discretion by ensuring that they understand the bases for imposing a death sentence, and comprehend their responsibilities in applying such criteria. It is only through the careful use of jury instructions that the judge properly discharges this function." *Whalen v. State,* 492 A.2d at 559.

Under Delaware law, a separate penalty hearing is conducted to determine whether a defendant, who has been found guilty of Murder in the First Degree, will be sentenced to death or life imprisonment without probation or parole. 11 *Del.C.* § 4209(b)(1). *Whalen v. State,* 492 A.2d at 559–60. Before recommending the imposition of a death sentence, the jury must engage in a two-step analysis. *Id.* First, it must make an initial finding of the existence of at least one statutory aggravating circumstance. *Id.* Second, it must weigh the aggravating circumstances against any mitigating circumstances found to exist. Unless the jury unanimously concludes that the aggravating circumstances outweigh the mitigating circumstances, the death penalty cannot be imposed. *Id.* The trial court's instructions to the jury must clearly convey that this two-part analysis still permits the jury to recommend against the death penalty no matter what aggravating circumstances are found to exist. *Id.*

In Dawson's case, the trial judge's misstatement was not made during his formal instructions to the jury. Rather, it occurred during his brief preliminary comments, intended to orient the jury, at the outset of the penalty hearing. Even so, during these prefatory remarks, the trial judge accurately told the jury that the penalty hearing was being conducted "to determine *whether* the defendant shall be sentenced to death or to life imprisonment." At the same time the trial judge accurately stated to the jury that "the law does not require you under any circumstances to recommend a sentence of death." The trial judge ended his introductory remarks by telling the jury that he would give them "detailed instructions on the applicable law at the conclusion of the

evidence" presented during the penalty hearing.

The sentencing decision was not ultimately submitted to the jury in Dawson's case on an impermissible legal theory. *Cf. Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931). Following the attorneys' closing arguments, the trial judge gave specific instructions concerning the law to be applied by the jury during the penalty phase. The jurors were properly advised that they could not impose a sentence of death unless they found beyond a reasonable doubt at least one statutory aggravating circumstance and unanimously recommended a sentence of death, after weighing all relevant evidence in aggravation and mitigation of the crime, and the particular characteristics and propensities of the defendant. During these formal instructions, the trial judge correctly instructed the jury that "regardless of the circumstances, they could recommend *against* the death penalty." [30] In addition, six copies of those written instructions, which accurately set forth the law, were provided to the jury.[31]

After reviewing the jury instructions in their entirety, we find that the trial judge's misstatement during his preliminary remarks was not prejudicial to any of Dawson's substantial rights and did not jeopardize the fairness or the integrity of the penalty hearing. *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 839–40, 93 L.Ed.2d 934 (1987). The trial court's actual instructions to the jury accurately, and on more

---

**30.** During the penalty proceeding, following the closing arguments, the Superior Court instructed the jury in part, as follows:

I shall now instruct you as to the applicable principles of law governing the punishment to be imposed in this case. No single one of these instructions states all of the law applicable to this determination. Therefore, you must listen to and consider *all* of these instructions together. You are to apply the law to the facts and in this way decide the punishment to be imposed in this case....

It is your function as the jury in this case to determine if the defendant will be sentenced to death or to life imprisonment without benefit of probation or parole or any other reduction. The law does not require you under any circumstances to recommend a sentence of death. *Instead, you may, in your discretion and regardless of the circumstances, recommend against imposition of the death penalty.* You are required, however, to consider a sentence of death as a possible punishment in this case.

The applicable portion of Delaware law provides: Any person who is convicted of first degree murder shall be punished by death or by imprisonment for the remainder of his or her natural life without benefit of probation or parole or any other reduction, said penalty to be determined in accordance with this section....

A sentence of death should not be imposed unless the jury finds:

1. Beyond a reasonable doubt at least one statutory aggravating circumstance; and

2. Unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. Where the jury submits such a finding and recommendation, the Court shall sentence the defendant to death....

If you have a reasonable doubt about the existence of a statutory aggravating circumstance, you must give the defendant the benefit of that reasonable doubt and find that such statutory aggravating circumstance does not exist....

If you do unanimously find beyond a reasonable doubt that one or more statutory aggravating circumstances exist, you must then weight and consider the mitigating circumstances and the aggravating circumstances including, but not limited to, the statutory aggravating circumstance or circumstances that you have already found to exist.

You must weigh all relevant evidence in aggravation and mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender.

In weighing the aggravating and mitigating circumstances, it is not a question of mere numbers of each, but rather the relative weight of each as compared to the other. In order to recommend a sentence of death, you must unanimously find that the aggravating factors outweigh the mitigating factors. *Regardless of the circumstances, you in your discretion may recommend that a sentence of life imprisonment without probation or parole be imposed.*

**31.** Members of the jury, you will have with you in the jury room all of the exhibits which have been introduced in the case and I will also be providing you with six copies of this instruction which I have just read along with the interrogatories for you to sign and a copy of the indictment Counts 3 through 15 for your reference.

than one occasion, advised the jury that it retained the option to recommend *against* the death penalty for Dawson, despite any aggravating factors it found to exist. *Flamer v. State*, 490 A.2d at 128. *Cf. Whalen v. State*, 492 A.2d at 559–60. We conclude that the trial court's erroneous introductory statement to the contrary was harmless beyond a reasonable doubt. *Id.* We find no reasonable likelihood that the trial court's misstatement at the commencement of the penalty hearing caused the Dawson jurors to misinterpret the actual and accurate instructions, which were subsequently given to them orally and in writing. *Boyde v. California*, — U.S. —, 110 S.Ct. 1190, 1197–98, 108 L.Ed.2d 316 (1990); *Flamer v. State*, 490 A.2d at 128.

## DEATH PENALTY REVIEW

Finally, we undertake our statutory obligation to review the imposition of the death penalty in this case. *See Riley v. State*, 496 A.2d at 1026; *Flamer v. State*, 490 A.2d at 137–45. 11 *Del.C.* § 4209(g)(2) provides as follows:

The Supreme Court shall limit its review under this section to the recommendation on an imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (e) of this section and, where applicable, § 636(a)(2)–(7) of this title.

In performing our review, in accordance with the statute, we are cognizant that "death as a punishment is unique in its severity and irrevocability." *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

■ Addressing subparagraph b of Section 4209(g)(2) first, the Dawson jury found the existence of three statutory aggravating circumstances. The first statutory aggravating circumstance found by the jury was that the murder was committed by a person who had escaped from a place of confinement. During the penalty hearing, the Superior Court quite properly instructed the jury that this statutory aggravating circumstance had been established beyond a reasonable doubt, as a matter of law, by virtue of Dawson's convictions at trial. Dawson had been convicted of violating 11 *Del.C.* § 636(a)(7) as charged in Count 13, 11 *Del.C.* § 636(a)(6) as charged in Count 11, and 11 *Del.C.* § 636(a)(2) as charged in Count 9.[32] The second statutory aggravating circumstance was that the killing occurred during the commission of a burglary and/or robbery. The Superior Court also properly instructed the jury that Dawson's felony murder conviction had established this statutory aggravating circumstance, as a matter of law. *See Deputy v. State*, Del.Supr., 500 A.2d 581, 602 (1985), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1589, 94 L.Ed.2d 778 (1987). The third statutory aggravating circumstance was that the murder was committed for pecuniary gain.

**32.** These respective sections of the *Delaware Code* provide in pertinent part that:

11 *Del.C.* § 636(a)(7):
A person is guilty of Murder in the First Degree when he causes the death of another person ... in the course of and in furtherance of the commission ... of escape ... after conviction.
11 *Del.C.* § 636(a)(6):
A person is guilty of Murder in the First Degree when he, with criminal negligence, causes the death of another person in the

course of and in furtherance of the commission or attempted commission of rape, kidnapping, arson in the first degree, robbery in the first degree, burglary in the first degree, or immediate flight therefrom.
11 *Del.C.* § 636(a)(2):
A person is guilty of Murder in the First Degree when, in the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person.

This issue was submitted to the jury. The jury unanimously found that it had been established beyond a reasonable doubt. We conclude that the evidence in the record supports the jury's findings that three of the statutory aggravating circumstances enumerated under Section 4209(e) had been established beyond a reasonable doubt in Dawson's case.

Two additional inquiries are required by subparagraph a of Section 4209(g)(2): first, whether the jury's imposition of the death penalty was either arbitrary or capricious, and second, whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under the statute. *Riley v. State*, Del.Supr., 496 A.2d 997, 1026 (1985). "Each question requires a consideration of the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender." *Id.;* 11 *Del.C.* § 4209(g)(2).

 The State's evidence with respect to the statutory aggravating circumstances established that the murder was committed by a person who had escaped from a place of confinement, the murder was committed while Dawson was engaged in the commission of burglary, and the murder was committed for pecuniary gain. The non-statutory aggravating circumstances upon which the State relied were Dawson's prior criminal record, his character and his propensities. In mitigation, Dawson offered evidence from two family members, his sister and an aunt, who testified that they loved him and that Dawson had once offered to donate a kidney to his cousin. After a careful review of the entire record, we find that the sentence of death was neither arbitrarily nor capriciously imposed by the jury. The record reflects that the weight of the statutory and non-statutory aggravating circumstances completely overwhelmed the mitigating circumstances.

 The remaining question which we now address, is whether the jury's recommendation that the death penalty be imposed in Dawson's case was disproportionate to the penalty recommended in similar cases arising under our statute. We have done so by reviewing the "universe" of cases established in *Flamer, Riley,* and *DeShields,* as well as all of the subsequent cases falling therein, i.e., we have compared Dawson's sentence with the penalties in all first degree murder cases which have gone to trial and a penalty hearing. *Riley v. State,* 496 A.2d at 1027–28; *Flamer v. State,* 490 A.2d at 140; (Appendix I). We have also considered objective factors such as the gravity of the offense, the circumstances of the defendant's crime, and the harshness of the penalty. *See Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983).

A definitive comparison of cases is almost impossible. *Riley v. State,* 496 A.2d at 1027; *Flamer v. State,* 490 A.2d at 144.

> "Individual jurors bring to their deliberations 'qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable.' The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that 'buil[d] discretion, equity, and flexibility into a legal system.'"

*McCleskey v. Kemp,* 107 S.Ct. at 1776, 1777.

We have reviewed the factual background of the applicable "universe" of cases. Dawson, like the other defendants sentenced to death in Delaware, was found guilty of committing an unprovoked, cold-blooded murder of a person who lacked the ability to defend herself, solely for pecuniary gain. *Riley v. State,* 496 A.2d at 1027. Dawson, like Billie Bailey, committed the murder while he was an escapee from a correctional institution. *Bailey v. State,* Del.Supr., 503 A.2d 1210 (1984). Moreover, the record in Dawson's case reflects the

existence of not one, but three statutory aggravating circumstances, significant non-statutory aggravating circumstances and virtually no evidence of mitigation. We find that the death sentences imposed upon Dawson are not comparatively disproportionate to the sentences in the other first degree murder cases that have proceeded to a penalty hearing pursuant to the Delaware statute, and in which at least one statutory aggravating circumstance was found to exist by the jury. *See Deputy v. State*, 500 A.2d at 602.

## CONCLUSION

The judgments of the Superior Court, which resulted in Dawson's convictions and sentences, including the imposition of the death sentences, are AFFIRMED.

## APPENDIX I
### FIRST DEGREE MURDER CASES THAT WENT TO PENALTY HEARINGS SINCE 1985

Case Name: William P. Baynard
Case No.: S84–050137, 0141
County: New Castle
Sentence: Life Imprisonment

Case Name: Randsford Bryan
Case No.: S87–11–0063
County: Sussex
Sentence: Life Imprisonment

Case Name: Vicky Chao
Case No.: IN88–031025–1025 & 1027, 1028
IN88–0832–0836
County: New Castle
Sentence: Life Imprisonment

Case Name: Carmelo J. Claudio
Case No.: IN87–030067–68
County: New Castle
Sentence: Life Imprisonment

Case Name: Lawrence R. Collingwood, Jr.
Case No. K87–09–0895–0901
County: Kent
Sentence: Life Imprisonment

Case Name: David F. Dawson
Case No.: IK87–010834 through 0847
County: Kent
Sentence: Death

Case Name: Kenneth W. DeShields
Case No.: IS84–080075–1075, –1275, –2075
County: Sussex
Sentence: Death

Case Name: James M. Elliotte
Case No.: IN81–110834 & 0835
County: New Castle
Sentence: Life Imprisonment

Case Name: Edward A. Fountain, Jr.
Case No.: IN84–120293 thru 0297
IN84–121795 thru 1797
County: New Castle
Sentence: Life Imprisonment

Case Name: Randolph Graham
Case No.: IK86–010059
County: Kent
Sentence: Life Imprisonment

| | |
|---|---|
| Case Name: | Charles K. Kelly |
| Case No.: | IN85–10–1671, 1672, 1673 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Joyce L. Lynch |
| Case No.: | IK88–010040 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | Stanley Newell |
| Case No.: | IN89–006109 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Ernest Charles Parson, Jr. |
| Case No.: | IN86–120380, 86–11136–1137 IN86–1144, 1147, 0381–0383, 1135 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Steven B. Pennell |
| Case No.: | IN88–120051–0053 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Vincent Perry |
| Case No.: | IN85–101668–1673 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Maurice Polk |
| Case No.: | S87–12–0093 |
| County: | Sussex |
| Sentence: | Life Imprisonment |
| Case Name: | Frederick James Roop |
| Case No.: | IN84–101691, 1692 |
| County: | New Castle |
| Sentence: | Life Imprisonment |
| Case Name: | Reginald N. Sanders |
| Case No.: | IK86–030898 through 0903 |
| County: | Kent |
| Sentence: | Death |
| Case Name: | Christie C. Shipley |
| Case No.: | IK85–020820 and 0821 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | Melvin Smart |
| Case No.: | S84–08–0037 and S84–08–0038 |
| County: | Sussex |
| Sentence: | Life Imprisonment |
| Case Name: | Desi Sykes |
| Case No.: | IK88–11005 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | Richard C. Thompson |
| Case No.: | IK86–010059 |
| County: | Kent |
| Sentence: | Life Imprisonment |
| Case Name: | Suzanne M. Triano |
| Case No.: | IN84–051701 |
| County: | New Castle |
| Sentence: | Life Imprisonment |

Case Name: Frank C. Whalen, Jr.
Case No.: IK77090035, 0036; IK78–030029
County: New Castle (venue changed)
Sentence: Life Imprisonment

Case Name: Lonnie Williams
Case No.: IN89–08–0638 through 0645
 IN89–09–0938 through 0943
County: New Castle
Sentence: Life Imprisonment